Wanda L. Ellert
PROSKAUER ROSE LLP
One Newark Center, 18th Floor
Newark, New Jersey 07102
973.274.3200
wellert@proskauer.com

Attorneys for Plaintiff
Church & Dwight Co., Inc.

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| CHURCH & DWIGHT CO., INC. | ) ) ) ) |
| Plaintiff, | ) Honorable Garrett E. Brown, Jr., U.S.D.J. ) Honorable John J. Hughes, U.S.M.J. |
| v. | ) ) Civil Action No. 05 CV 2142 (GEB) (JJH) |
| ABBOTT LABORATORIES, | ) ) |
| Defendant. | ) ) ) |

## MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S
## RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW THAT
## PLAINTIFF IS NOT ENTITLED TO DAMAGES FOR SALES OF PRODUCTS
## MANUFACTURED PRIOR TO JULY 1, 2001 BY GENZYME AND/OR WYNTEK

## Table of Contents

**Page**

PRELIMINARY STATEMENT .................................................................................1

STATEMENT OF FACTS.....................................................................................6

ARGUMENT.....................................................................................................10

I.     Abbott Waived The Right To Pursue An Affirmative Defense of Implied License
       By Failing To Assert It In Any Pleading Prior To Its Motion For Summary
       Judgment Served On The Eve Of Trial ...............................................................10

II.    Even if Abbott Did Not Waive its Implied License Defense, Its Rule 50(b) Motion
       Should Be Denied Because There Is Sufficient Evidence In The Record To Justify
       Any Findings That the Jury May Have Made on that Defense......................................15

       A     Under Any Scenario, There is Evidence to Support the Jury's Findings...............16

             1.    There is Evidence that the Jury Fully Credited Abbott's Defense .............17

             2.    The Record Supports a Finding That There Was No Implied
                   License .............................................................................................18

                   (i)     The Record Supports a Finding that the Genzyme  License
                           was Not Broad Enough to Give Rise to an  Implied License
                           to Abbott.....................................................................................19

             3.    The Record Supports a Finding that C&D Was Not Fully
                   Compensated by the Genzyme Payment.................................................23

       B     To The Extent The Jury's Verdict Is Unclear But Consistent With All
             Possible Outcomes, The Appropriate Remedy Is To Let The Verdict Stand
             – Not To Grant A New Trial Or Reduce the Jury's Award ...............................28

CONCLUSION...................................................................................................30

# Table of Authorities

**Page**

**CASES**

*Aro Mfg. Co., Inc. v. Convertible Top Replacement Co., Inc.,*
   377 U.S. 476 (1964) .................................................................18, 19, 23, 24, 25

*Arrow Communication Labs., Inc. v. Pico Prod., Inc.,*
   615 N.Y.S.2d 187 (N.Y. App. Div. 1994) ...........................................22

*Atkins v. Fischer,*
   331 F.3d 988 (D.C. Cir. 2003) ...................................................18

*Bandag, Inc. v. Al Bolser's Tire Stores, Inc.,*
   750 F.2d 903 (Fed. Cir. 1984).....................................................18

*Baychar, Inc. v. Salomon N. Am.,*
   2006 WL 2061400 (D.Me. July 19, 2006), *report and recommendation*
   *adopted by*, 2006 WL 3209934 (D. Me. Nov. 6, 2006) ...........................26-27, 28

*California Table Grape Comm'n v. RB Sandrini, Inc.,*
   2007 WL 1847631 (E.D. Cal. June 27, 2007) .............................. 10, 11

*Cequent Trailer Prods., Inc. v. Intradin (Shangai) Mach. Co. Ltd.,*
   2007 WL 438140 (N.D. Ohio Feb. 7, 2007)......................................18

*Clarke v. Bruckner,*
   93 F.R.D. 666 (D.V.I. 1982) ......................................................15

*Dean v. Brandywine Studios Inc.,*
   2003 WL 299362 (D. Del. Fed. 10, 2003)........................................15

*Dimensional Communs., Inc. v. Oz Optics, Ltd.,*
   148 Fed. Appx. 82 (3d Cir. 2005) ...............................................13

*Eastern Minerals & Chems. Co. v. Mahan,*
   225 F.3d 330 (3d Cir. 2000) ....................................................14

*Eighth Ave. Coach Corp. v. City of New York,*
   286 N.Y. 84 (N.Y. 1941) ........................................................20

*Glass Equip. Dev., Inc. v. Besten, Inc.,*
   174 F.3d 1337 (Fed. Cir. 1997)..................................................22

*Glenayre Elecs., Inc. v. Jackson,*
   443 F.3d 851 (Fed. Cir. 2006)............................................. 18, 24, 25

*Globespanvirata, Inc. v. Texas Instruments Inc.*,
    2005 WL 1638136 (D.N.J. Jul. 12, 2005) ...........................................................14

*Hindorf v. Westinghouse Elec. Corp.*,
    1990 WL 74491 (E.D.Pa. June 4, 1990), *aff'd*, 925 F.2d 417 (3d Cir. 1991) ........................15

*Hulmes v. Honda Motor Co., Ltd.*,
    960 F. Supp. 844 (D.N.J. 1997), *aff'd*, 141 F.3d 1154 (3d Cir. 1998)..................................16

*Hutchins v. UPS*,
    2005 U.S. Dist. LEXIS 15625 (D.N.J. July 26, 2005) ..........................................14

*In re Mahurkar Double Lumen Hemodialysis Catheter Patent Litig.*,
    831 F. Supp. 1354 (N.D. Ill. 1993), *aff'd*, 71 F.3d 1573 (Fed Cir. 1995) ............. 18, 23-24, 25

*Joseph v. Rowlen*,
    425 F.2d 1010 (7th Cir. 1970) ...........................................................29

*Kass v. Kass*,
    673 N.Y.S.2d 350 (N.Y. 1998) ...........................................................20

*Lexington Ins. Co. v. Combustion Eng'g, Inc.*,
    693 N.Y.S.2d 146 (N.Y. App. Div. 1999)...........................................................21

*LG Elecs., Inc. v. Bizcom Elecs., Inc.*,
    453 F.3d 1364 (Fed. Cir. 2006)...........................................................18

*Lighting Lube, Inc. v. Witco Corp.*,
    4 F.3d 1153 (3d Cir. 1993) ...........................................................15

*Lucent Techs., Inc. v. Newbridge Networks Corp.*,
    168 F. Supp.2d 181 (D. Del. 2001) ...........................................................18

*Maramont Corp. v. B. Barks & Sons, Inc.*,
    1999 WL 55175 (E.D. Pa. Jan. 13, 1999)...........................................................10, 14

*Met-Coil Sys. Corp. v. Korners Unlimited, Inc.*,
    803 F.2d 684 (Fed Cir. 1986)...........................................................22

*Ortho-Tain, Inc. v. Rocky Mountain Orthodontics, Inc.*,
    2007 U.S. Dist. LEXIS 31081 (N.D. Ill. Apr. 25, 2007)...........................................................10, 13

*Prevent, Inc. v. Wnck, Inc.*,
    1994 WL 530144 (E.D. Pa. Sept. 28, 1994) ...........................................................10, 14

*Prime Ins. Syndicate v. United Risk Mgmt. Servs., Inc.*,
    Civ. A. No. 03-1050 (SRC), 2006 U.S. Dist. LEXIS 50670 (D.N.J. July 25, 2006)..............14

*Raiczyk v. Ocean County Veterinary Hosp.,*
    377 F.3d 266 (3d Cir. 2004) ............................................................15

*Richardson v. Frank,*
    1989 WL 135370 (E.D.Pa. Nov. 7, 1989) ......................................14

*S&W Enters., LLC v. Southtrust Bank of Ala., NA,*
    315 F.3d 533 (5th Cir. 2003) .........................................................14

*Therasense, Inc. v. Becton, Dickinson & Co.,*
    2007 U.S. Dist. LEXIS 86410 (D. Cal. 2007) ................................14

*Time Warner Entertainment Co., L.P. v. Brustowsky,*
    634 N.Y.S.2d 82 (N.Y. App. Div. 1995).................................19, 23

*United States v. Nat'l R.R. Passenger Corp.,*
    2004 WL 1335250 (E.D.Pa. June 15, 2004)............................10, 14

*Wyeth v. Teva Pharms. United States, Inc.,*
    2005 U.S. Dist. LEXIS 40055 (D.N.J. Aug. 3, 2005) ....................14

*Zodiac Enter., Inc. v. Am. Broad. Co.,*
    440 N.Y.S.2d 240 (N.Y. App. Div. 1981), *aff'd*, 452 N.Y.S.2d 20 (N.Y. 1982) .............19, 23

## OTHER AUTHORITIES

Fed. R. Civ. P. 8(c)...........................................................................2, 10

Fed. R. Civ. P. 15..............................................................................13

Fed. R. Civ. P. 16..............................................................................13

Fed. R. Civ. P. 49(b) .........................................................................29

Fed. R. Civ. P. 50(a)............................................................................8

Fed. R. Civ. P.  50(b) .......................................................... 1, 8, 9, 15, 29

Plaintiff Church & Dwight Co., Inc. ("C&D") respectfully submits this memorandum of law in opposition to Defendant Abbott Laboratories' ("Abbott") renewed motion, pursuant to Rule 50(b) of the Federal Rules of Civil Procedure, for judgment as a matter of law that C&D is not entitled to damages for sales of infringing over-the-counter ("OTC") pregnancy test kits ("PTKs") manufactured by Wyntek Diagnostics, Inc. ("Wyntek") and/or Genzyme Corporation ("Genzyme") that were sold to Abbott prior to July 1, 2001.

## PRELIMINARY STATEMENT

Abbott's motion is simply one more, meritless attempt to evade the consequences of the jury's verdict that Abbott willfully infringed the Charlton Patents. Indeed, the argument that Abbott advances here – for the fourth time – is among its most frivolous. Abbott claims that the jury's verdict should be tossed aside and judgment entered in its favor as a matter of law because, allegedly, Abbott had an "implied license" from C&D to re-sell products in the OTC market that it purchased from Wyntek or Genzyme prior to July 1, 2001 (the "Pre-July 2001 G/W Products"). According to Abbott, C&D has already been "fully compensated" for any damages it suffered as a result of those sales when it received ███████████████████ pursuant to a certain Patent License Agreement (the "Genzyme License") ███████████████ ██████████████████████████████. As a result, Abbott argues, C&D is not entitled to any damages attributable to those sales.

Abbott contends that this "implied license" theory was one of its affirmative defenses, that the jury wrongfully rejected it, that no rational jury could have done so, and that, therefore, this Court must reject the jury's verdict as a matter of law and either direct an entire new trial on the issues of damages or, alternatively, dramatically reduce the damages awarded C&D according to an artificial calculation that Abbott now proposes.

1

As we will show below, this argument is not just wrong on every count, it borders on the indefensible. Indeed, as demonstrated in Point I, the affirmative defense of an implied license has never been part of this case and Abbott plainly waived any right to try to rely upon it now. The first time Abbott ever mentioned this "defense" was in its summary judgment papers filed in December 2007, on the eve of trial and long after discovery had ended. Abbott never mentioned this theory in its pleadings -- in fact, the words "implied license" appear nowhere in its answer -- notwithstanding that a defense based on a license is specifically identified in Fed. R. Civ. P. 8(c) as one to be pled with specificity. Nor did Abbott ever try to advance such a defense during the trial, not so much as mentioning it once to the jury, notwithstanding that it is a legal defense to be determined by the trier of fact and one on which Abbott bore the burden of proof. Nor did Abbott ask the Court to include any mention of an implied license defense in its charge to the jury or to give the jury a single instruction on any element of such a defense. Nor, finally, did Abbott ever request that the jury answer an interrogatory or issue a special verdict relating to an implied license defense such that the record would reflect what it found in that regard.

In these circumstances, Abbott cannot seriously maintain that this imaginary affirmative defense – on which it had the full burden of proof – was ever part of its case, let alone presented to the jury and wrongfully rejected. Abbott's belated effort to argue that one of the affirmative defenses it did plead – that C&D's "claims are barred by the doctrine of estoppel" – was sufficient to plead an affirmative defense of implied license is absurd on its face and belied by Abbott's conduct. Rule 8(c) lists "estoppel" and "license" separately, requiring each to be stated "affirmatively" if they are to be raised as defenses; no amount of linguistic legerdemain can transform one into the other for pleading purposes. In any case, when explicitly asked in an interrogatory to "State the basis for Abbott's contention that C&D's claims are barred by the

2

doctrines of … estoppel," Abbott never once even hinted, either in its initial or supplemental answers to that question, that its "estoppel" defense was based upon a theory of an implied license.  In fact, Abbott's interrogatory answers to that specific question did not so much as mention the Genzyme License on which Abbott now relies.

If Abbott truly intended from the outset that its estoppel defense was somehow "shorthand" for raising an affirmative defense of implied license, it was surely required to say so in response to direct interrogatories seeking that very information.   Having no notice of this defense, C&D did not take any discovery to defend against it.  At a minimum, that discovery would have probed, *inter alia*, the intentions of the parties who negotiated the Genzyme License to show that it never included an implied license for sales by Abbott and that it was ███████ ████████████████████████████████████████████████████████.  Likewise, discovery would have been taken to show that the █████████████████████████████ ████████████████████████████████████████████ ██████████████████████████████████ – a fact conclusively demonstrated by the jury award for many times that amount.

Only two possibilities can explain Abbott's conduct: either it never thought to assert an implied license defense until the eve of trial (contrary to what it now represents) or it chose to conceal its intentions until that time.  Either way, it must be held to have waived that defense and cannot rely upon it now to reverse the jury's verdict.

But there is an even more obvious reason why Abbott's motion must fail.  As we show in Point II below, the verdict can be supported by alternative theories, each of which has support in the record.  To begin with, there is simply no basis on which to assert that Abbott "lost" on its implied license defense, and thus no basis for Abbott to insist that the jury's verdict be set aside.

Abbott's "implied license" defense is a partial defense – even if successful, it would only reduce the damages awarded C&D.  This follows because Abbott does not contend that its implied license immunized all of its infringing sales of Genzyme/Wyntek products, only those manufactured by Wyntek and Genzyme prior to July 1, 2001.  Nor, *a fortiori*, does Abbott contend that it had any license, implied or otherwise, to permit sales of products manufactured by Abbott itself or by Abbott's other supplier.  Since the jury found that *all* of Abbott's sales infringed, it still would have issued a general verdict for C&D even if it found that there was an implied license allowing Abbott to sell a portion of the infringing products.  Thus, Abbott cannot show that the jury did not fully credit Abbott's implied license defense and that it didn't *reduce* the amount of damages it awarded C&D by the entire amount that Abbott now claims should have been deducted.  Indeed, the damages sought by C&D were over $30 million, yet the award was less than half that amount.

It goes without saying that if Abbott prevailed in full on its affirmative defense, it has no basis to seek a JMOL now.  In fact, were the Court to accept Abbott's alternative demand to reduce the damage award at this time, the result might well be to penalize C&D by making the same deduction twice – once by the jury and once by the Court.

In the end,  Abbott can only speculate that it lost on its implied defense.  But that is no basis on which to set a verdict aside.  That is particularly true since any uncertainty about what the jury did is purely a result of Abbott's trial strategy.  It is black-letter law that Abbott bore the burden of proof on its implied license defense.  To the extent Abbott wanted to preserve its right to challenge the jury verdict on the grounds it now asserts, at a minimum, Abbott should have requested interrogatories to the jury or a special verdict to elicit specific findings on the issues

4

relevant to that defense, such as whether Abbott had an implied license and, if so, the amount of any "offset" in Abbott's favor that should be credited against any damage award.

Abbott did none of that. It made no objection to the verdict form submitted to the jury and requested no modification to accommodate its implied license defense. Indeed, after the jury returned its verdict, the Court specifically asked counsel "is there any reason why I should not thank and discharge the jury at this time?" Again, Abbott raised no objection and asked for no clarification from the jury as to how it treated its implied license defense. (2/15/08 Tr. at 8:23-8:25) Having elected not to pursue any of these opportunities before the jury was discharged, Abbott cannot be allowed to *assume* that the jury found against it in order to seek a brand new trial to resolve uncertainties it could have avoided.[1]



Alternatively, the jury was entitled to conclude that the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ For that reason, Abbott's defense of an implied license must also fail. Not only does the agreement ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (This is discussed at Point II(A)(2)(i) below.) Moreover, to the extent there are ambiguities, they must be resolved against Abbott; it had the full burden of proof but failed to proffer a single piece of evidence other than the Genzyme License itself.

To carry its burden of proof, Abbott had to show in the first instance that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. The language in the Genzyme License makes it impossible to answer that question in Abbott's favor. On its face, ▮▮▮▮▮▮▮▮

---

[1]    Abbott likewise never asked for a single instruction to the jury dealing with its defense, such as an instruction requiring the jury to omit certain sales from its damage calculation if it found that an implied license existed.

████████████████████████████████ Thus, the jury could well have relied upon the Genzyme License alone to find against Abbott on its defense.  That possibility is all that is required to mandate a denial of Abbott's JMOL motion.  At the very least, the language in the agreement is ambiguous, which would have required a finding by the trier of fact as to the correct meaning, intention and scope of the agreement.  Yet Abbott presented no evidence to support its interpretation and carry its burden of proof – yet another reason to deny its motion.

Even if the jury agreed with Abbott's construction of the Genzyme License, there would still be a separate fact question that the jury would confront:  was the ██████████████ ████████████████████████████████, including those attributable to Abbott's tens of millions of dollars of infringing sales?  Plainly, there was evidence at trial to support a negative answer to that question, including, *inter alia*, uncontested sales data and credible expert testimony.  Of course, it is also possible that the jury accepted part of Abbott's defense (that the Genzyme License resulted in an implied license to Abbott), but found against Abbott on the corollary *fact issue* whether the ███████████████████████████████████████

To summarize, there are many reasons to deny Abbott's JMOL motion.  We now address each of them in detail.

## STATEMENT OF FACTS

Abbott and Wyntek entered into two agreements, dated June 16, 1998 and April 22, 1998, respectively, under which Wyntek supplied Abbott with PTKs for resale in the private label segment of the OTC PTK market.  (*See* PTX 16-17)  On January 21, 2000, Abbott and Wyntek entered into a third agreement, under which Wyntek supplied Abbott with PTKs for resale in the premium segment of the OTC PTK market.  (PTX 17)  According to sales figures supplied by Genzyme (which was subsequently acquired Wyntek), Wyntek supplied product to Abbott from 1998 through 2002.  (PTX 25)

Genzyme and Carter-Wallace, Inc. a predecessor to C&D (C&D and Carter-Wallace are hereinafter referred to collectively as "C&D"), entered into a Patent License Agreement (the "Genzyme License"), ███████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████

On April 20, 2005, C&D filed its complaint against Abbott alleging that Abbott infringed each of the three Charlton Patents. (Dk. 1)[2] Abbott answered the complaint on September 6, 2005, but never asserted any affirmative defense of "implied license" in its answer or in any subsequent pleading. (Dk. 7) *Abbott raised this defense for the first time in a motion for summary judgment filed with the Court on December 14, 2007 – a few weeks before trial.* (Dk. 110) At a pretrial conference on December 28, 2007 before Magistrate Hughes, C&D objected on the ground, *inter alia*, that Abbott had waived the right to pursue such a defense, by summary judgment or otherwise, because it failed to include the defense in its pleadings. Given the

---

[2]  References to "Dk." refer to entries on the docket sheet for this action.

untimely nature of Abbott's motion, Magistrate Hughes entered an Order directing that Abbott's motion for summary judgment be withdrawn without prejudice to its right to renew the argument as a Rule 50(a) motion. (Dk. 116) Magistrate Hughes made no ruling with respect to whether Abbott had waived the right to pursue the defense, leaving the issue to be decided by the Court if and when Abbott made a Rule 50(a) motion. However, in directing that Abbott's implied license defense should be raised in such a motion, Magistrate Hughes clearly signaled to Abbott that it should be trying its implied license defense to the jury.

Not satisfied with Magistrate Hughes' ruling, Abbott filed its Pretrial Brief on January 8, 2008, and requested that this Court overrule his Order and decide Abbott's implied license defense as a matter of law "before trial in order to streamline the issues that need to be considered by the jury." (Dk. 124 at 25.) The Court declined Abbott's invitation and the case proceeded to trial with the clear understanding that, subject to C&D's objection that the defense had been waived, if Abbott wanted to pursue its defense it would have to present supporting evidence at trial.

During the trial, Abbott filed a Rule 50(a) motion with respect to its implied license defense on January 29, 2008 and a renewal of that motion on February 8, 2008 (Dk. 177 and 224). The Court declined to rule on Abbott's motions, and thus Abbott's implied license defense was deemed submitted to the jury under Rule 50(b).

Notwithstanding that Abbott bore the burden of proof on its affirmative defense, Abbott did not request that any instructions be given the jury, nor that the verdict form include any questions, pertaining to that defense, nor did it ask that any interrogatories be given to the jury that would reveal for the record whether or not it accepted or rejected Abbott's implied license defense or how much of the jury's damages award, if any, the jury had allocated to the Pre-July

2001 G/W Products. Instead, Abbott opted to go with the general verdict form that was ultimately submitted to the jury. That verdict sheet simply asked the jury to decide whether or not each of the asserted claims in the Charlton Patents were valid and infringed and to allocate the damages between lost profits and reasonable royalties. (Dk. 232.)

On February 15, 2008, the jury returned a verdict in favor of C&D, finding that all of the asserted claims in the Charlton Patents were valid and infringed and awarding C&D $14.6 million in damages, which was less than half of the damages it claimed. ( Dk. 232.) Given the amount of the jury's award, it is impossible to determine with certainty how the jury resolved Abbott's implied license defense, as the jury's verdict could support a finding either for or against Abbott on its affirmative defense. However, when the jury returned its verdict and before it was discharged, the Court specifically asked counsel "is there any reason why I should not thank and discharge the jury at this time?" Abbott raised no objection nor asked for any clarification from the jury as to whether or not it had considered Abbott's implied license defense, and if so, how it had been resolved. (2/15/08 Tr. at 8:23-8:25)

On March 7, 2008, Abbott filed its present motion for judgment as a matter of law under Rule 50(b) – the fourth time Abbott is attempting to have this Court usurp the jury's role and find for Abbott on a defense it studiously avoided presenting to the jury, notwithstanding the various factual questions raised by that defense.

As we will now show, Abbott's motion must fail for a host of compelling reasons.

## ARGUMENT

**I.    Abbott Waived The Right To Pursue An Affirmative Defense of
Implied License By Failing To Assert It In Any Pleading
Prior To Its Motion For Summary Judgment Served On The Eve Of Trial**

Pursuant to Rule 8(c), certain defenses must be affirmatively pled or they risk being waived. Fed. R. Civ. P. 8(c); *Ortho-Tain, Inc. v. Rocky Mountain Orthodontics, Inc.*, 2007 U.S. Dist. LEXIS 31081, at \*10-\*11 (N.D. Ill. Apr. 25, 2007); *United States v. Nat'l R.R. Passenger Corp.,* 2004 WL 1335250, at \*3 (E.D.Pa. June 15, 2004); *Maramont Corp. v. B. Barks & Sons, Inc.,* 1999 WL 55175, at \*5 (E.D. Pa. Jan. 13, 1999); *Prevent, Inc. v. Wnck, Inc.,* 1994 WL 530144, at \*2 (E.D. Pa. Sept. 28, 1994).

Among the defenses that are specifically required under Rule 8(c) to be pled affirmatively in a party's answer are defenses based on a release or a license, implied or otherwise. Nonetheless, while Abbott's answer raises ten separate affirmative defenses, not one of them states, in words or substance, that Abbott has an implied license or is otherwise entitled to "diminished liability" because of the release in the Genzyme License. In fact, the words "implied license" never appear in Abbott's pleadings. For that reason alone, its implied license defense must be considered waived.

Abbott makes no effort to explain why it did not plainly and forthrightly plead its implied license defense. Instead, Abbott tries to shoehorn that defense into one that it did plead – estoppel. To that end, Abbott cites a number of cases for the proposition that an implied license is a "form" of legal estoppel. One such case is *California Table Grape Comm'n v. RB Sandrini, Inc.*, 2007 WL 1847631 (E.D. Cal. June 27, 2007). Abbott claims that, like the defendant in that case, it sufficiently pled its license defense because its Third Affirmative Defense states that "Plaintiff's claims are barred by the doctrine of estoppel." (Dk. 7).

In fact, *California Table Grape Comm'n* underscores the lack of merit to Abbott's position.  Noticeably absent from Abbott's discussion of that decision is the court's criticism of the plaintiff for failing to propound discovery to ascertain the basis for defendant's estoppel defense.  *California Table Grape Comm'n*, 2007 WL 1847631 at *24 ("The commission could have, but did not raise a Rule 12 motion to Sandrini's defenses and has had ample time to propound discovery to ascertain the facts supporting the estoppel defense.").  In contrast, C&D did precisely what the *California Table Grape Comm'n* court suggested by propounding the following interrogatory to Abbott to clarify exactly what Abbott meant by its vague reference to "estoppel" in its Third Affirmative Defense:

> **INTERROGATORY NO. 8:**  State the basis for Abbott's contention that C&D's claims are barred by the doctrines of laches, ***estoppel***, unclean hands, and/or waiver.  (PTX 497) (Emphasis added.)

Making no mention whatsoever of its implied license defense based on the release in the Genzyme License, which Abbott now labels a "legal estoppel" defense, Abbott responded, in pertinent part, to this interrogatory as follows:

> … Abbott states that at least as early as February 27, 1998, C&D accused Abbott of infringing United States Patent No. 5,714,389.  C&D then acquiesced to Abbott's manufacture and sale of Abbott's OTC and professional rapid chromatographic assays.  C&D failed to file a complaint alleging infringement by any of those products until April 20, 2005.  Abbott's reliance on C&D's acquiescence and failure to file a complaint until April 20, 2005, bars each of C&D's claims of infringement under the doctrines of ***estoppel***, laches and/or waiver.  (*See* PTX 497) (Emphasis added.)

In short, even assuming *arguendo* that pleading an estoppel defense may be tantamount to pleading an implied license, Abbott intentionally and knowingly waived that defense when it failed to identify it as a basis for its "estoppel" defense in response to a specific interrogatory.  Nothing in *California Table Grape Comm'n* or any other case Abbott cites allows a defendant to rely on a defense that it never pled and which it failed to mention in answering an interrogatory proposed to elicit that very information.

11

Tellingly, Abbott's motion omits any mention of the interrogatory or its misleading answer. Instead, Abbott contends that it put C&D on sufficient notice of its implied license defense by its answer to a different interrogatory – Interrogatory No. 7. (Abbott's JMOL Br. at 18.) But that interrogatory had nothing to do with Abbott's Third Affirmative defense of "estoppel," which Abbott now contends was based on its theory of implied license. Interrogatory 7 was instead expressly directed to Abbott's Eighth Affirmative Defense, which simply stated that "Abbott has not infringed and does not infringe any claim of the asserted patents." (Dk. 7) Thus, Interrogatory No. 7 asked:

> **INTERROGATORY NO. 7.** For each Abbott Test Product manufactured, used, offered for sale or sold by or on behalf of Abbott in the Unites States OTC market at any time since April 1999, state the basis for Abbott's contention, if any, that such product does not infringe the C&D patents-in-suit either literally or under the doctrine of equivalents, and for each such Abbott Test Product, identify each and every claim limitation which Abbott contends is not met by the product and for each limitation alleged not to be met, provide the claim construction which Abbott contends is proper for that limitation and identify in detail all intrinsic and extrinsic evidence supporting that claim construction.

(*See* PTX 495.) Abbott's answer to this interrogatory stated in part, without any explanation, that Abbott ███████████████████████████████ That, however, was hardly sufficient to put C&D on notice that Abbott was going to rely upon an implied license defense.

First, as noted, Interrogatory No. 7 was specifically and only directed to Abbott's non-infringement defense. When specifically asked in another interrogatory for the bases of its estoppel defense – which Abbott claims included its implied license defense – Abbott failed to mention implied license. C&D can hardly be expected to guess that the estoppel defense was really an implied license defense simply because the Genzyme License was mentioned in another interrogatory directed to a different defense. That is particularly true since, like its other interrogatory answer, Abbott's answer to Interrogatory No. 7 omits any mention of an implied

license.  In any case, Abbott admits that 

(*See* Abbott's Br. at 3-4.)  Since the accused Abbott products in this case were sold exclusively in the OTC market,

, would hardly signal anything about an implied license in the OTC field.

For reasons precisely like these, the law makes crystal clear that a party cannot cure a pleading defect by pointing to an interrogatory answer or other discovery response.  *See, e.g.*, *Ortho-Tain, Inc.* 2007 U.S. Dist. LEXIS 31081, at *10-*11 ("While it is possible that [plaintiff] is slightly less confused following the interrogatories, the interrogatory simply cannot sure a defect in a pleading").  As the case at bar illustrates, it is inherently unfair to ask a party to ferret out a defense hidden in an interrogatory answer.

Indeed, by arguing that its October 31, 2006 response to Interrogatory No. 7 was sufficient to cure its pleading defect, Abbott is essentially arguing that its discovery response constituted an informal amendment to its answer.  However, in making this argument, Abbott blithely ignores that this response was not served until ***three months*** after the Court-imposed deadline for filing any motions to amend the pleadings, which deadline had been extended at Abbott's request.  (Dk. 14)  Moreover, on July 28, 2006, Abbott sought to amend its pleadings to add an additional plaintiff but never sought to assert its implied license defense.  (Dk. 16-17) Abbott also ignores well-settled law that absent "good cause" Abbott would not have been allowed to formally amend its answer under Rules 15 and 16, much less to indirectly amend its pleading through the service of an ambiguous interrogatory.[3]

---

[3]    *See* Fed. R. Civ. P. 15 and 16; *Dimensional Communs., Inc. v. Oz Optics, Ltd.*, 148 Fed. Appx. 82, 85 (3d Cir. 2005) ("failure to satisfy Rule 16(b)'s 'good cause' requirement was sufficient to deny a motion to amend filed six months after the deadline for amendments to

C&D was clearly prejudiced by Abbott's failure to raise its implied license defense until well after all expert and fact discovery and less than a month before trial.[4] Had Abbott forthrightly asserted the defense of implied license in its answer or even in response to C&D's interrogatory seeking the bases for Abbott's estoppel defense, C&D would have timely sought discovery from Genzyme and Abbott regarding, *inter alia*: (a) the scope and interpretation of the Genzyme License; (b) ████████████████████████████████████

████████████████████████████████████

---

pleadings.") (citing *Eastern Minerals & Chems. Co. v. Mahan*, 225 F.3d 330, 340 (3d Cir. 2000) (when a party moves to amend the deadlines established in the pretrial scheduling order, the party must first satisfy Rule 16(b) of the Federal Rules of Civil Procedure and demonstrate good cause); *Prime Ins. Syndicate v. United Risk Mgmt. Servs., Inc.*, Civ. A. No. 03-1050 (SRC), 2006 U.S. Dist. LEXIS 50670, at *12-13 (D.N.J. July 25, 2006) (request to amend pleadings to include new claims denied where Plaintiff failed to provide a reason why it could not have asserted the new claims within the requisite deadlines); *Hutchins v. UPS*, 2005 U.S. Dist. LEXIS 15625 (D.N.J. July 26, 2005) (court denied motion to amend pleadings because, *inter alia*, moving party failed to show that he could not have brought the claims earlier); *Wyeth v. Teva Pharms. United States, Inc.*, 2005 U.S. Dist. LEXIS 40055, *9-10 (D.N.J. Aug. 3, 2005) (citing *Globespanvirata, Inc. v. Texas Instruments Inc.*, 2005 WL 1638136, *3 (D.N.J. Jul. 12, 2005); *S&W Enters., LLC v. Southtrust Bank of Ala., NA*, 315 F.3d 533, 535 (5th Cir. 2003)); *Therasense, Inc. v. Becton, Dickinson & Co.*, 2007 U.S. Dist. LEXIS 86410 at *2-3 (D. Cal. 2007) (denying a motion for leave to amend to add an inequitable conduct claim because party seeking to amend was not diligent in investigating or seeking to amend to assert the claim). Having unduly delayed in seeking to amend its answer to add its implied license defense by July 28, 2006 and having made no attempt demonstrate "good cause" to excuse its failure, Abbott should not be allowed to be deemed to have informally amended its answer via its October 31, 2006 interrogatory response.

[4]    *See Richardson v. Frank,* 1989 WL 135370 (E.D.Pa. Nov. 7, 1989) ("Failure to amend a complaint until virtually the eve of trial, presents a situation where delay can only be viewed as undue.  Where a complaint has been amended at the eleventh hour, the defendant is unduly prejudiced by being forced to delay an imminent trial and reopen a completely new line of discovery, often as or after discovery was scheduled to be complete.")  *See also, Nat'l R.R. Passenger Corp.,* 2004 WL 1335250, at *3 (affirmative defense of release waived where it wasn't raised in any pleadings and plaintiff would be prejudiced by its tardy introduction); *Maramont Corp.,* 1999 WL 55175, at *5 (affirmative defense of receipt waived where not raised in pleadings and only raised in summary judgment motion two weeks before close of discovery); *Prevent, Inc.,* 1994 WL 530144, at *2 (refusing to allow amendment of complaint to add affirmative defense because it would be unfair as it require additional discovery).

███████████████████████████████████████████████

████████████████████████████████

As noted, only two possibilities can explain Abbott's decision not to articulate its implied license defense until after the close of discovery and a mere few weeks before trial: either it never thought to assert an implied license defense until the trial -- which belies the representations it makes in its motion papers -- or it chose to conceal its intentions until that time. Either way, Abbott must be held to have waived that defense and cannot rely upon it now to reverse the jury's verdict. For this reason alone, its Rule 50(b) motion should be denied.

## II.    Even if Abbott Did Not Waive its Implied License Defense, Its Rule 50(b) Motion Should Be Denied Because There Is Sufficient Evidence In The Record To Justify Any Findings That the Jury May Have Made on that Defense

To sustain its burden on a JMOL motion *after* the jury has returned its verdict, Abbott must establish: (a) that the jury, in fact, rejected Abbott's implied license defense; and (b) that there is insufficient evidence upon which the jury could properly find for C&D. Fed. R. Civ. P. 50(b); *Lighting Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir. 1993); *Clarke v. Bruckner*, 93 F.R.D. 666, 667 (D.V.I. 1982) ("as the moving party under Rule 50(b), Bruckner is also viewed as bearing the burden of proof on the aforementioned issues"); *Raiczyk v. Ocean County Veterinary Hosp.,* 377 F.3d 266, 268 (3d Cir. 2004) ("A judge may overturn a jury verdict only when, as a matter of law, the record is critically deficient of that minimum quantity of evidence from which a jury might reasonably afford relief.").

The moving party on a JMOL motion has a "strenuous" burden. *Dean v. Brandywine Studios Inc.*, 2003 WL 299362 at *1 (D. Del. Fed. 10, 2003); *Hindorf v. Westinghouse Elec. Corp.*, 1990 WL 74491 at *2 (E.D.Pa. June 4, 1990), *aff'd*, 925 F.2d 417 (3d Cir. 1991) ("A movant under Rule 50(b) has a strenuous burden in that, as a matter of law, the record must be critically deficient of that minimum quantity of evidence in order to obtain relief"). That burden

is even higher where, as here, the moving party bore burden of proof at trial. *Hulmes v. Honda Motor Co., Ltd.*, 960 F. Supp. 844, 853, n.5 (D.N.J. 1997), *aff'd*, 141 F.3d 1154 (3d Cir. 1998) (JMOL " is an extraordinary remedy when urged by an unsuccessful [party] who bore the burden of proof at trial'").

Abbott cannot possibly satisfy these rigorous standards. Indeed, it cannot even meet the threshold test of establishing that the jury found against it on its implied license defense (assuming it was part of the case). As noted above, Abbott cannot establish that the jury did not find in its favor on its defense and that it did not reduce the damage award to C&D accordingly. But even if the jury did reject Abbott's defense, in whole in part, there is evidence in the record that supports such a result. In fact, under any possible scenario, the record supports the jury's decision. That is all that is necessary to defeat Abbott's motion. *See Raiczyk,* 377 F.3d at 268.

## A    Under Any Scenario, There is Evidence to Support the Jury's Findings

To be sure, there is no way to know precisely what the jury determined with respect to Abbott's implied license defense. That, however, is purely the result of Abbott's decision not to request any special interrogatory or special verdict that would have gone to the jury; instead, Abbott sat silently and approved the general verdict form that was submitted. Likewise, Abbott chose not to seek clarification of the jury's verdict in response to the Court's invitation before discharging the jury. (2/15/08 Tr. at. 8:23-8:25) In these circumstances, if the record supports any determinations that the jury conceivably made, Abbott's motion should fail.

There are three possible scenarios that may have occurred. First, the jury may have adopted Abbott's defense in its entirety, in which case Abbott has no cause to complain. Second, the jury may have found that the Genzyme License did not establish an implied license in Abbott's favor. Third, the jury may have found that the Genzyme License did establish an implied license but that C&D was not "fully compensated" ██████████████████

16

███████ such that C&D would still be entitled to recover its damages from Abbott.  If the record supports any of these findings by the jury, Abbott's motion should be denied.   Here, the record supports each.

### 1.    There is Evidence that the Jury Fully Credited Abbott's Defense

Needless to say, if the jury accepted Abbott's defense and reduced the damage award to C&D accordingly, Abbott has no ground to set the verdict aside and either obtain an entire new trial or an "additional" reduction of the damages for which it is liable.  The record supports a conclusion that that is precisely what the jury may have done.

The Genzyme License was before the jury, having been introduced by Abbott.  (DTX 82) The jury also heard evidence that C&D's damages exceeded $31 million.  (*See, e.g.*, PDX 5, 12, 14-17; PTX 46, 79, 86, 89, 142, 204, 303, 336, 341, 343, 345, 347, 349-50, 353, 354, 356, 358, 368; 1/25/08 a.m. Tr. at 11:3-94:3; 1/25/08 a.m. Sealed Tr. at 4:4-35:3; 1/25/08 p.m. Tr. 4:6-46:7; 1/25/08 p.m. Sealed Tr. 4:5-15:16; 2/7/08 Tr. at 7:6-95:25)  Yet, the jury's award was less than half that amount.  Plainly, this Court cannot rule out the possibility that the jury reduced its award to take account of Abbott's implied license defense.   However unlikely it may be that this occurred – given that Abbott never once argued the defense to the jury and never asked that any instruction on the defense be included in the Court's charge – the theoretical possibility remains that the jury fully credited Abbott for the defense and did not assess any damages against it relating to the Pre-July 2001 G/W Products.  Having failed to take any available steps to make a record that would allow Abbott to show otherwise, Abbott cannot demand a new trial or any post-trial modification of the jury's verdict simply because it speculates that the jury erred.  For this reason alone, and without having to consider any other possible scenario, Abbott's motion should be denied.

## 2.    <u>The Record Supports a Finding That There Was No Implied License</u>

It is well-established that Abbott – **not C&D** – bore the burden of proving its affirmative

defense of implied license.  *See, LG Elecs., Inc. v. Bizcom Elecs., Inc.*, 453 F.3d 1364, 1369

(Fed. Cir. 2006) ("In a suit for patent infringement, the burden of proving the establishment of an

implied license falls upon the defendant"); *Atkins v. Fischer*, 331 F.3d 988, 992 (D.C. Cir. 2003)

("Because the existence of an implied license is an affirmative defense to infringement, the

alleged infringers have the burden of establishing an implied license"); *Bandag, Inc. v. Al

Bolser's Tire Stores, Inc.*, 750 F.2d 903, 924 (Fed. Cir. 1984) ("In a suit for patent infringement,

the burden of proving the establishment of an implied license falls upon the defendant"); *Lucent

Techs., Inc. v. Newbridge Networks Corp.*, 168 F. Supp.2d 181, 240 (D. Del. 2001) ("The

existence of an implied license is an affirmative defense to an action for patent infringement, and

the party asserting this defense has the burden on establishing that an implied license exists

under the facts of the case").

To sustain this burden, Abbott was required to prove that the ███████████████

███████████████████████████████████████████████████████████████████

██████  If Abbott established that fact, it would then have to prove that the ██████████████

████████████████████████████████████████████████████████ relating to the

Pre-July 2001 G/W Products so as to preclude C&D from seeking any additional compensation

from other joint tortfeasors, like Abbott.  *See Aro Mfg. Co., Inc. v. Convertible Top Replacement

Co., Inc.*, 377 U.S. 476, 500-501 and 512 (1964); *Glenayre Elecs., Inc. v. Jackson*, 443 F.3d 851,

871-72 (Fed. Cir. 2006); *Cequent Trailer Prods., Inc. v. Intradin (Shangai) Mach. Co. Ltd.*, 2007

WL 438140 (N.D. Ohio Feb. 7, 2007); *In re Mahurkar Double Lumen Hemodialysis Catheter

Patent Litig.*, 831 F. Supp. 1354 (N.D. Ill. 1993), *aff'd*, 71 F.3d 1573 (Fed Cir. 1995).

Abbott attempts to treat these issues as if they are all issues of law for the Court. That is simply erroneous. For example, whether C&D is fully compensated is unquestionably an issue of fact for jury. *Aro Mfg. Co., Inc.*, 377 U.S. at 513 ("***Where [as here] a private release of past infringement which does not purport to release others is involved, the adequacy of the compensation must always be a question of fact.***") (emphasis added). Also, to the extent there is any uncertainty regarding the meaning of various terms of the Genzyme License, which is plainly the case, that too is a question of fact for the jury. *Time Warner Entertainment Co., L.P. v. Brustowsky*, 634 N.Y.S.2d 82, 82-83 (N.Y. App. Div. 1995); *Zodiac Enter., Inc. v. Am. Broad. Co.*, 440 N.Y.S.2d 240, 241 (N.Y. App. Div. 1981), *aff'd*, 452 N.Y.S.2d 20 (N.Y. 1982).[5] Abbott bore the burden of proving these issues before the jury, and if Abbott did not carry its burden of proof, it cannot seek to overturn the verdict on a JMOL motion.

> **(i)     The Record Supports a Finding that the Genzyme License was Not Broad Enough to Give Rise to an Implied License to Abbott**

There is no dispute that the only evidence proffered by Abbott concerning the interpretation of §4.1 of the Genzyme License is the agreement itself. (DTX 82). To make a case for an implied license, Abbott contends, first, that ███████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████ Neither contention has merit.

To begin with, the e████████████████████████████████████ ████████████████████████████████████████████████████

---

[5] ████████████████████████████████████████████████████



[redacted]

[redacted]

[redacted]

[redacted] the fundamental cannon of contract construction that a "contract must be read as a whole in order to determine its purpose and intent, and that single clauses cannot be construed by taking them out of their context and giving them an interpretation apart from the contract of which they are a part." *Eighth Ave. Coach Corp. v. City of New York*, 286 N.Y. 84, 89 (N.Y. 1941). *See, also, Kass v. Kass*, 673 N.Y.S.2d 350, 357 (N.Y. 1998) (when a contract makes the parties' overall intention clear, courts examining isolated provisions "should then choose that construction which will carry out the plain purpose and object of the agreement.").

---

6 [redacted]

Despite the foregoing, Abbott argues that the ████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████

Abbott's argument runs counter to another well-established principle of contract interpretation: "a release should not be construed to dispose of matters which the parties did not desire or intend." *Lexington Ins. Co. v. Combustion Eng'g, Inc.,* 693 N.Y.S.2d 146, 148 (N.Y. App. Div. 1999). ████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████████████ The parties did nothing of the sort.

There are two additional reasons why Abbott's interpretation of the release in the Genzyme License must fail. First, it would lead to a bizarre and illogical result: Abbott would actually receive a broader "implied" license than the express license granted to Genzyme. ██████

██████████████████████████████████████████████████████

21

████████████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

██████ (*See* Abbott's JMOL Br. at 2)  It is hornbook law that a construction of the agreement

that would lead to such an anomalous and inconsistent result is disfavored.  ███████████████

████████████████████████████████████████████████████

███████████████████████████

Second, to establish an implied license to sell in the OTC market, Abbott would have to

prove that absent such a license, there would be no non-infringing uses for the product it

acquired from Genzyme or Wyntek, and (b) the circumstances of the sale must plainly indicate

that the grant of a license should be inferred.  *Glass Equip. Dev., Inc. v. Besten, Inc.*, 174 F.3d

1337, 1342-43 (Fed. Cir. 1997) (infringer bears burden of showing the existence of implied

license); *Met-Coil Sys. Corp. v. Korners Unlimited, Inc.*, 803 F.2d 684, 686 (Fed Cir. 1986).  It is

clear, however, that there were non-infringing uses of the Pre-July 2001 G/W Products available

to Abbott -- *i.e.*, ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████

At a minimum, the foregoing shows that Abbott's construction of the release in the

Genzyme License was by no means the ***only*** fair and reasonable one, and thus cannot preclude

C&D's interpretation "as a matter of law".  *See Arrow Communication Labs., Inc. v. Pico Prod.,*

*Inc.*, 615 N.Y.S.2d 187, 188 (N.Y. App. Div. 1994) ("A party seeking summary judgment has

the burden of establishing that the construction it favors 'is the only construction which can

fairly be placed thereon'").  Being subject to differing interpretations, the question of the

ultimate meaning of the relevant provisions in the Genzyme License must go to the jury.  *See*

*Time Warner Entertainment Co., L.P*, 634 N.Y.S.2d at 82-83 (resolution by fact finder is

required where interpretation of contract term is susceptible to varying reasonable

interpretations, and intent must be gleaned from disputed evidence or from inferences outside

written words); *Zodiac Enter., Inc.*, 440 N.Y.S.2d at 241.  Plainly, the jury could have found that

those provisions did not support Abbott's interpretation – on which Abbott had the burden of

proof – and that its implied license defense therefore failed.

### 3.    The Record Supports a Finding that C&D Was Not Fully Compensated by the Genzyme Payment

The third scenario that may have occurred is that the jury agreed with Abbott's

interpretation of the Genzyme License ████████████████████████████

███████, but found against Abbott on the question of whether C&D had been "fully

compensated" by the ███████████████████.  There is support in the record for this

possible determination as well.

The Supreme Court has held that:  "Where [as here] a private release of past infringement

which does not purport to release others is involved, the adequacy of the compensation must

always be a question of fact."  *Aro Mfg. Co., Inc.*, 377 U.S. at 513.  Accordingly, even if the

Genzyme License was found to be broad enough to give rise to an implied license in Abbott's

favor in the ███████████, C&D would still be entitled to recover its damages from Abbott's

infringing sales of the Pre-July 2001 G/W Products unless the jury also found that Genzyme's

payment "fully compensated" C&D for the damages it would have been entitled to receive from

all joint tortfeasors, including Abbott.

Said differently, a finding of an implied license only gives rise to a potential offset

against damages otherwise recoverable from Abbott.  *In re Mahurkar*, 831 F. Supp. at 1393 ("as

all infringers are jointly and severally liable, a settlement by one infringer [simply] reduces the recovery from the others…."). This follows from the well-established principle underlying the implied license defense, *i.e.*, "that parties that make and sell an infringing device are joint tortfeasors with parties that purchase an infringing device for use or resale;" and that each such "joint tortfeasor is liable for the full amount of damages (***up to a full single recovery***) suffered by the patentee." *Glenayre Elecs., Inc.*, 443 F.3d at 871-72 (emphasis added). *See also, Aro Mfg. Co., Inc.*, 377 U.S. at 500-501 and 512 ("a contributory infringer is a species of joint-tortfeasor," and "judgment against one joint trespasser, ***without full satisfaction***, is no bar to a suit against another for the same trespass... [Only] full satisfaction received from one tortfeasor prevents further recovery against another").

The amount of the offset that Abbott would be entitled to receive (assuming it proved an implied license) should equal "the amount of money [C&D] would have made had the infringers [Genzyme, Wyntek and Abbott] not infringed" ████████████████████ ████████████████████ *Glenayre Elecs., Inc.*, 443 F.3d at 872; *Aro Mfg. Co., Inc.*, 377 U.S. at 502-503 and 609. The decision in *In re Mahurkar*, illustrates how an offset in Abbott's favor would be determined. The defendant in that case, IMPRA was found to have infringed a patent relating to catheters for use in hemodialysis. For a period of time, IMPRA had purchased the catheters from Kendall Med-West ("Kendall"). Shortly before the trial against IMPRA, Kendall enter into an agreement with the patent owners under which it paid them $870,000 and withdrew from the hemodialysis market. IMPRA, like Abbott here, argued that that agreement released it from any liability on the catheters it purchased from Kendall.

There was no dispute that the Kendall agreement was broad enough to cover Kendall's sales of product to IMPRA and that, as a result, IMPRA was entitled to assert that it had an

implied license. Consequently, there (unlike here), the sole question for the trier of fact (it was a bench trial) was how much of an offset IMPRA was entitled to receive as a credit against damages it would otherwise owe. In determining the amount of the offset, the court rejected IMPRA's argument that it was entitled to a credit for the full amount of the $870,000 paid by Kendall since Kendall only sold 16% of its output to IMPRA. Thus, IMPRA received a credit of $139,200 (*i.e.*, 16% of $870,000) as a result of the Kendall settlement. *In re Mahurkar*, 831 F. Supp. at 1392-93.[7]

Under the approach outlined in *In re Mahurkar*, which is consistent with Supreme Court and Federal Circuit precedent (*see, e.g., Aro Mfg. Co., Inc.* and *Glenayre Elecs., Inc., supra*), if Abbott proved that it had an implied license, it would be entitled to no more than an offset of ███

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████ That offset would then be deducted from damages otherwise awarded against Abbott. Abbott, however, never even attempted to show what the proper percentage of ███ ████████ would be and its motion should fail on that ground alone.

Although nowhere mentioned in its JMOL motion, Abbott contends in its motion for a new trial that if the Court doesn't grant a new trial, it should reduce the jury's award by $4,727,150 (*i.e.*, the amount of damages Abbott claims that the jury awarded to C&D for the damages C&D's suffered in connection with the Pre-July 2001 G/W Products). (*See* Abbott New Trial Br. at 19.) Abbott's only support for its $4.7 million figure is to misinterpret a

---

[7]    Abbott attempts to distinguish *In re Mahurkar* on the ground that the release in plaintiffs' agreement with Kendall was limited to Kendall's right to make the accused product and did not extend to Kendall's customers' right to sell such product. This supposed distinction, even if true, is irrelevant. The court found that the release gave rise to an implied license, which then gave rise to an offset, and the amount of the offset had nothing to do with whether or not the release was limited to making or selling the infringing product.

reference in a footnote in a report by one of C&D's experts that was never introduced into evidence and has no business being submitted by Abbott to the Court at this time.[8]  The point here, however, is that by asking for an offset of $4.7 million Abbott is conceding that ███ ████████████████████████ could not possibly have been "full compensation" for the damages suffered by C&D.

     With respect to the evidence before the jury on the issue of whether C&D had been "fully compensated" by ██████████████████████████, C&D submitted to the jury testimony and documents substantiating the far larger amount of damages C&D suffered as a result of Abbott's sale of the Pre-July 2001 G/W Products.  (*See, e.g.*, PDX 5, 12, 14-17; PTX 46, 79, 86, 89, 142, 204, 303, 336, 341, 343, 345, 347, 349-50, 353, 354, 356, 358, 368; 1/25/08 a.m. Tr. at 11:3-94:3; 1/25/08 a.m. Sealed Tr. at 4:4-35:3; 1/25/08 p.m. Tr. 4:6-46:7; 1/25/08 p.m. Sealed Tr. 4:5-15:16; 2/7/08 Tr. at 7:6-95:25)  C&D was in no way, shape or form "fully compensated" through its receipt of ████████████████████, and if Abbott's argument means anything, it demonstrates that C&D was not fully compensated by a payment of ████████████████ that Abbott contends amount to at least  $4.7 million.

     In contrast to C&D's exhaustive proof on this issue, Abbott points only to the language in the release in the Genzyme License, claiming that, as matter of law, it should be construed as finding that C&D was "fully compensated."  In support of its position, Abbott relies exclusively on a magistrate's decision in *Baychar, Inc. v. Salomon N. Am.*, 2006 WL 2061400 (D.Me. July

---

[8]   Abbott also argues that the fact that C&D's expert performed an alternative calculation excluding certain Genzyme/Wyntek sales signifies that C&D knew that an implied license defense was in the case.  This is flatly wrong.  The alternative calculation was prepared in response to Abbott's non-infringement defense stated in its answer to Interrogatory No. 7. Indeed, had C&D believed that Abbott was asserting an "implied license" defense, the alternative calculation would have been completely different, as it would have addressed the possible offset that would be due Abbott if there was a finding of an implied license, *i.e.*, some percentage of the ████████.

19, 2006), *report and recommendation adopted by*, 2006 WL 3209934 (D. Me. Nov. 6, 2006).

Abbott's reliance on this decision is misplaced.

In that case, Baychar owned a patent related to an insulating technology for outdoor

apparel. In a prior action, Baychar had sued various manufacturers of insulating material

(collectively referred to as "Schoeller") that allegedly incorporated Baychar's patented

technology. Baychar settled that action and gave a release to Schoeller. Subsequently, Baychar

sued Salomon, which had purchased the infringing insulated materials from Schoeller and had

incorporated such materials into outdoor apparel. On a motion for summary judgment, the

magistrate found that Salomon and Schoeller were joint tortfeasors, and that Salomon would be

deemed to have received an implied license. The question was whether Baychar had received

"full compensation." The magistrate, however, noted that the "existing summary judgment

record is not designed to enable a factual finding that compares the value of the settlement

proceeds to the value of a reasonable royalty on the Schoeller parties and Salomon's combined

infringing sales, plus interest and other actual damages that might be proved." *Baychar, Inc.*,

2006 WL 2061400 at *8, n.9. *The statement by the magistrate is an implicit acknowledgement*

*that, had such evidence been available and presented by Baychar, the magistrate would have*

*been obligated under the controlling precedent to make such a determination of whether*

*Baychar had in fact received "full compensation" as a result of its settlement with Schoeller*

*that would have precluded a suit against Salomon for, in effect, a double recovery.*

In the absence of evidence concerning Baychar's damages, the magistrate determined that

Baychar received "full compensation" because the Settlement Agreement and the court's

Consent Judgment recited that the payment received by Baychar was in "*full satisfaction* of all

past claims of Baychar against Schoeller for money damages *arising out of this Action*." *Baychar, Inc.*, 2006 WL 2061400 at *5 and 8, n.9 (emphasis added).

The "arising out of this Action" language is particularly significant as Baychar obviously sought an award in the Action against Schoeller of "all damages" resulting from the allegedly infringing activity for which Schoeller *and Salomon* were both jointly and severally liable. Thus, having stated that it received "full satisfaction" for all damages "arising out that Action," the magistrate construed this language to mean that Baychar agreed that it was "fully compensated" for all damages it suffered from the alleged infringement.

Here, in contrast, the Genzyme License did not settle any action between C&D and Genzyme, nor did it purport to release Genzyme (let alone its customers) for all past claims arising out of any action.  Nor does it state in words or substance that C&D received full compensation or to use the words in *Baychar* "full satisfaction."  Instead, the release is given in exchange for a "full and complete release" of Wyntek, Genzyme and its Affiliates for any claim of infringement without commenting at all upon the adequacy of the consideration received by C&D for subsequent release into the permitted professional field of use, much less the OTC field of use which was forbidden.  If anything, the limited nature of the release indicates the parties' intent that C&D, which was not "fully compensated" by Genzyme's payment of ▮▮▮▮▮, was free to seek additional compensation from Genzyme's joint tortfeasors, including Abbott.

**B    To The Extent The Jury's Verdict Is Unclear But Consistent With All Possible Outcomes, The Appropriate Remedy Is To Let The Verdict Stand – Not To Grant A New Trial Or Reduce the Jury's Award**

Notwithstanding the fact that there is sufficient evidence in the record to support any of the foregoing scenarios that possibly underlie the jury's verdict, Abbott's seeks via its separate motion for a new trial brief either a new trial on damages or a reduction of the jury's damages award.  Neither relief is appropriate under this situation.

Indeed, Abbott can only now attempt to divine the jury's actual reaction to Abbott's implied license defense because **Abbott** failed to take the basic precautions necessary to preserve its right to properly challenge the jury's verdict on a rule 50(b) motion.  At a minimum, Abbott could have requested under Rule 49(b) that the following two questions be submitted to the jury in connection with the verdict form:  (a) Do you find that Abbott had an implied license to sell the Pre-July 2001 G/W Products?; and (b) To what damages, if any, is C&D entitled based on the Pre-July 2001 G/W Products?  Abbott also could have requested clarification from the jury before it was discharged, but specifically declined to do so.  (2/15/08 Tr. at. 8:23-8:25)  *See Joseph v. Rowlen*, 425 F.2d 1010, 1012 (7th Cir. 1970) ("The proper time to object to a verdict which may appear ambiguous or somehow deficient is at the time it is returned and before the jury is discharged").

Having failed to take such steps to preserve its ability to determine with certainty how the jury ruled on its implied license defense, Abbott should not be given a deduction or leave to retry the damages portion of this case because of Abbott's obvious failure to take steps to determine with certainty how the jury ruled on its purported affirmative defense.  Similarly, it is grossly improper and prejudicial to C&D for Abbott to request that this Court speculate that the jury found against Abbott and order what might well be a second reduction in the amount of C&D's damages, once by the jury and once by the Court.  This is particularly inappropriate because Abbott has no basis whatsoever to propose what the deduction should be.

## CONCLUSION

In light of the foregoing, C&D respectfully requests that this Court deny Abbott's motion for a renewed motion for judgment as a matter of law, deny its request for a new trial on damages, deny its alternative request to unilaterally reduce the amount of the jury's award to C&D, and award C&D such other and further relief as this Court deems just and appropriate.

CHURCH & DWIGHT CO., INC.

By its attorrneys,

s/ Wanda L. Ellert
Wanda L. Ellert (wellert@proskauer.com)
PROSKAUER ROSE LLP
One Newark Center, 18th Floor
Newark, New Jersey 07102
973.274.3200
wellert@proskauer.com

Richard M. Goldstein
James H. Shalek
Baldassare Vinti
John C. Stellabotte
Steven H. Holinstat
PROSKAUER ROSE LLP
1585 Broadway
New York, New York  10036-8299
(212) 969-3000

Attorneys for Plaintiff
Church & Dwight Co., Inc.

Dated:  March 25, 2008