<u>NOT FOR PUBLICATION</u>

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

---

|  |  |  |
|---|---|---|
| CHURCH & DWIGHT CO., INC. | : | Civ. No. 05-2142 (GEB) (JJH) |
|  | : |  |
| Plaintiff, | : | **MEMORANDUM OPINION** |
|  | : |  |
| v. | : |  |
|  | : |  |
| ABBOTT LABORATORIES, | : |  |
|  | : |  |
| Defendant. | : |  |
|  | : |  |

---

<u>BROWN, Chief Judge</u>

This matter comes before the Court upon defendant Abbott Laboratories' ("Abbott")
Motion for Judgment that Plaintiff's Claim of Damages is Barred Under the Doctrine of Laches
(Docket No. 318).  For the reasons set forth below, the Court denies Abbott's motion.

## I.      BACKGROUND

### A.      Procedural History

This case involves three patents owned by Church & Dwight Co., Inc. ("C&D") related to
over the counter pregnancy tests:  U.S. Patent Nos. 5,714,389 ("the '389 Patent"), 5,989,921
("the '921 Patent"), and 6,485,982 ("the '982 Patent") (collectively, the "Charlton Patents").  The
Charlton Patents were issued on February 3, 1998, November 23, 1999, and November 26, 2002,
respectively.  C&D alleged that from 1998 to September 2003, Abbott infringed the Charlton
Patents by selling a line of products under the brand name Fact Plus (the "Accused Products").

Three companies manufactured the Accused Products sold by Abbott:  Abbott, Wyntek and ABI.

C&D alleged that the products manufactured by Abbott, Wyntek and ABI infringed claims 1, 5,

6, 7, and 10 of the '389 Patent; claims 8 and 9 of the '921 Patent; and claims 7 and 19 of the '982

Patent.  C&D also alleged that the ABI-manufactured test infringed claim 9 of the '389 Patent.

A trial was held from January 17, 2008 to February 15, 2008.  The jury found that C&D

proved by a preponderance of the evidence that Abbott literally infringed, contributed to the

literal infringement of, or induced literal infringement of the Charlton Patents as outlined above.

Moreover the jury found that Abbott had not proven by clear and convincing evidence that any of

the claims at issue were invalid.  The jury also found that C&D showed by a preponderance of

the evidence that it was entitled to recover: (1) lost profits in the amount of $10,250,000.00; and

(2) a reasonable royalty of $4,350,000.00 for infringing sales.  Finally, the jury found that C&D

proved by clear and convincing evidence that Abbott's infringement was willful.

On March 7, 2008, Abbott filed a motion for Judgement as a Matter of Law that the

Asserted Claims are Invalid, Not Infringed or Willfully Infringed, and that Plaintiff is Not

Entitled to an Award of Damages ("JMOL") (Docket No. 256).  Among other arguments, Abbott

asserted that C&D was not entitled to damages under the doctrine of laches.  (JMOL Mem. Op.,

19 (Docket No. 292.))  The Court denied Abbott's request for a judgment as a matter of law that

C&D is barred by laches from recovering damages for the infringement of the '389 Patent,

holding that C&D had rebutted the presumption of laches because it met its burden of coming

forward with sufficient evidence to raise a genuine factual issue respecting the reasonableness of

its delay in bringing suit against Abbott.  *Id*. at 25.  The Court also held that Abbott had not

2

presented evidence to support its laches defense with respect to the'921 and '982 Patents.  *Id.* at

26.  However, because the laches defense was not part of the jury trial, the Court found that

Abbott had not had the opportunity to put forth evidence regarding this argument. *Id.* at 26.  The

Court granted Abbott leave to re-file after the presentation of evidence in support of Abbott's

laches defense for all of the Charlton Patents. *Id.* On August 27, 2008, a non-jury trial was held

in which Abbott put forth such evidence and by October 14, 2008, the matter was fully briefed by

both parties.

      **B.**    **Facts**

          **1.**    **1998 Discussions**

      On February 27, 1998, Kevin B. Clarke, Patent Counsel to Carter-Wallace, Inc. ("Carter-

Wallace"), C&D's predecessor in interest in the Charlton Patents, sent a letter to Miles White,

Abbott's President.   In that letter, Mr. Clarke referenced the '389 Patent, the only one of the

Charlton Patents that had issued at that time (PTX38), and stated that "I bring this patent to your

attention in view of your sale and/or manufacture of various OTC and professional rapid

chromatographic assays in the United States," that "Carter-Wallace, Inc. is interested in

exploring the licensing of this new patent," and he asked Mr. White to contact him regarding this

issue.  *Id.*  When Abbott did not respond, Mr. Clarke sent a follow up letter on March 27, 1998,

in which he stated "if I do not hear from you by close of business on April 15, 1998, I will

assume you have no interest in discussing a license and we will consider such other actions as we

deem appropriate." (PTX39.)  Communications between Abbott and Carter-Wallace

subsequently commenced and included a June 5, 1998 telephone conversation between Dr. Jane

Smith, Technology Licensing Manager for Abbott, and Carter-Wallace's Mr. Clarke.  (DTX493; Aug. 27, 2008 Tr. at 59:2-22.)  According to an August 24, 1998 letter from Dr. Smith memorializing this conversation, Dr. Smith had requested licensing terms for the '389 Patent; however Mr. Clarke represented that Carter-Wallace was not able to provide such terms at that time because they were in the process of concluding two other licensing agreements for the same patent.  (DTX493; Aug. 27, 2008 Tr. at 59:16-22.)  Through the August 24, 1998 letter, Dr. Smith requested a copy of any licensing terms that might have been developed through Carter-Wallace's negotiations with other parties .  (DTX493.)  Mr. Clarke responded to Dr. Smith on August 28, 1998, indicating that it appeared that Carter-Wallace would not be able to engage in discussions regarding licensing of the '389 Patent to Abbott until after Labor Day and that he "look[ed] forward to discussing the matter" at that time.  (DTX1042.)

## 2.    Interference Proceedings

Subsequent to these discussions, Carter-Wallace was involved in two interference proceedings regarding the '982 Patent and the '389 Patent and patents assigned to Becton, Dickinson and Company ("Becton Dickinson") (the "Interference Proceedings").  (PTX106; PTX488. )   Specifically, the United States Patent and Trademark Office ("USPTO") declared interference with the '982 Patent on October 5, 1998 and the '389 Patent on November 19, 1999. (PTX106; PTX488 at 2.)   After several years of litigation, the Interference Proceedings were resolved in Carter-Wallace's favor on April 2, 2001 (for the '982 Patent) and April, 23, 2001 (for the '389 Patent).  (PTX491, PTX488.)

## 3.    2001 Discussions

While there is evidence that Abbott contacted Carter-Wallace regarding another set of patents in early December 2000 (DTX1034; DTX1035), the next documented communication between these parties regarding the Charlton Patents occurred in March 2001. (Aug. 27, 2008 Tr. at 61:14-65:2; PTX581.)  According to the handwritten notes of Andrew Schapals, then the Technology Licensing  Manager for Abbott, a phone conversation occurred between Mr. Schapals and Mr. Clarke on March 8, 2001, where Mr. Clarke informed Mr. Schapals of the Interference Proceedings and his belief that Charlton Patents had priority over the Becton Dickinson patents.  (PTX581; Sept. 16, 2008 Tr. at 108:16-110:12.)[1]  A subsequent phone conversation took place between Mr. Schapals and Mr. Clarke on March 20, 2001, where both parties indicated a willingness to enter discussions regarding licensing of the Charlton Patents as well as other patents owned by Abbott.  (PTX381, PTX581.)  On April 18, 2001, Mr. Schapals sent Mr. Clarke a follow up letter, reiterating "a willingness on Abbott's part to enter into discussions" and enclosing a non-disclosure agreement for C&D's review. (PTX581; PTX381). Mr. Schapals and Mr. Clarke engaged in subsequent discussions in August 2001, which included Carter-Wallace's submission of a confidentiality agreement to Abbott on August 29, 2001. (DTX1039; Aug. 27, 2008 Tr. at 65:22-67:5; PTX582.)

_____

[1] Abbott notes that this Court granted C&D's request to submit excerpts of Mr. Schapals' deposition testimony which was taken on September 22, 2008 in connection with the litigation *Abbott Labs. et al. v. Church & Dwight Co., Inc*., No. 07-3428 (N.D. Ill. Def.'s Claim Construction Brief filed Nov. 10, 2008) (MFK) and requests that the portion of Mr. Clarke's deposition testimony, taken on September 26, 2008 in connection with that same litigation and attached as Exhibit U to the Certification of Melissa Steedle Bogad, also be entered into evidence. (Abbott's Unsealed Br. (Docket No. 305) at 14 n. 3; (Docket No. 302)).  The Court hereby grants Abbott's request.

On September 13, 2001, Mr. Clarke sent a letter to Mr. Schapals and enclosed Carter-Wallace's own non-disclosure agreement, which, the letter stated, incorporated language utilized in a recent agreement between these two parties that was executed in another matter. (PTX40 at ABBOTT/C&D 118422.) The letter also enclosed copies of several patents, including the Charlton Patents, which were "available to Abbott for licensing." *Id.*  The letter also noted Carter-Wallace's victories in the Interference Proceedings and stated that Carter-Wallace "believe[s] that it is very difficult for anyone to sell visually readable lateral flow test strips without infringing one or more of the Carter-Wallace, Inc. patents." *Id.* at ABBOTT/C&D 118423.

### 4.    Carter-Wallace's Sale to Armkel

In October 2001, Carter-Wallace sold its consumer products division to C&D and Armkel LLC ("Armkel"), which is a joint venture between C&D and Kelso & Co.  (PTX587.)  At that time, Armkel acquired the Charlton Patents. (PTX384; Jan. 24, 2008 Tr. a.m. at 59:15-61:1.) News articles found in his files indicate that Mr. Schapals was aware of this transaction around the time that it took place. (PTX584; PTX585; PTX587; Aug. 27, 2008 Tr. at 87:18-20.)  In 2005, C&D acquired Armkel and the Charlton Patents. (PTX384.)

### 5.    Litigation with Third Parties

On August 26, 2002, Armkel sued Pfizer, Inc. ("Pfizer") for infringement of the Charlton Patents (the "Pfizer Litigation"). (Jan. 24, 1998 Tr. a.m. at 61:2-18.)[2]   Pfizer contacted Abbott on

---

[2]Citing *Inductotherm Indus. v. United States*,  No. 99-2451, 2002 U.S. Dist. LEXIS 14046, at *6-7 (D.N.J. Mar. 27, 2002) for the proposition that "[a] court may take judicial notice of a document filed in another court not for the truth of the matters asserted in the other

April 4, 2003 regarding the litigation and on April 11, 2003 forwarded Abbott a draft subpoena

which it planned to serve on Abbott.  (PTX568.)  On May 12, 2003, Pfizer forwarded a subpoena

to Abbott, which it formally served on Abbott on May 19, 2003, in order to obtain information

that it anticipated would be helpful in its defense against Armkel's allegations and in its attempt

to invalidate the Charlton Patents.  (PTX569; PTX570.)  C&D settled with Pfizer on June 23,

2003.  (PTX 169.)

Armkel also joined Inverness Medical Innovations ("Inverness") in an enforcement action

against Acon Laboratories (the "Acon Litigation) in early 2004. (Jan. 24, 2008 Tr. p.m. at

18:22-19:6.)  After several years of litigation, the parties settled the matter some time in the

spring of 2006. (Jan. 24, 2008 Tr. p.m. (Sidebar) at  18:14-19:9; 34:7-25.)

In March 2004, Armkel and Inverness commenced another enforcement action against the

Quidel Corporation (the "Quidel Litigation").  (Jan. 24, 2008 Tr. p.m. at 18:22-19:6.)  After

several years of litigation, this matter settled June 27, 2006*.  Inverness Medical v. Quidel Corp*.,

No. 04-0489 (S.D. Cal. 2006).

### 6.       2004 Discussions

The next documented contact between Abbott and C&D regarding the Charlton Patents

occurred on February 2, 2004, when Susan Goldy, C&D's General Counsel and chief counsel to

---

litigation, but rather to establish the fact of such litigation and related filings," Abbott requests
that this Court take judicial notice of the date on which Inverness filed its complaint against
Quidel. *Id.* (internal citations omitted); Bogad Cert. Ex. Q at 4.   The Court hereby grants
Abbott's request and also takes judicial notice of the date on the parties settled in that matter (see
below) as well as the date on which Armkel filed suit against Pfizer. *See Armkel, LLC v. Pfizer,
Inc.*. No. 02-4206 (D.N.J. 2006).

Armkel, sent a letter to Jose M. de Lasa, Abbott's Senior Vice President and General Counsel.
(PTX47.)  In that letter, Ms. Goldy noted that she had been reviewing past correspondence from
Carter-Wallace to Abbott in which "Carter-Wallace raised infringement claims under its
Charlton patents directed against Abbott's PTK [pregnancy test kit] product line,"  and indicated
that she would like to discuss the matter.  *Id.*  Ms. Goldy also specifically referenced Armkel's
enforcement of its rights against Pfizer as well as enforcement of its rights against  "another
supplier of PTK products," which, based on the timing of the letter, is likely a reference to the
Acon litigation.  *Id.*

On February 6, 2004, Regina M. Anderson, counsel to Abbott, responded to Ms. Goldy,
stating that Abbott would review its records and contact her to discuss the issues raised in her
February 2, 2004 letter. (PTX44.)  Despite apparent scheduling conflicts, discussions between the
parties took place over the ensuing months up and through May 2004.  (Jan. 24, 2008 Tr. p.m.
(Sidebar) at 21:6-25:6; PTX556; PTX557; PTX558.) Then, on June 14, 2004, Winston &
Strawn, Abbott's counsel in the instant litigation, sent a letter to C&D requesting a waiver of a
potential conflict of interest to allow the firm to represent Abbott in these discussions.
(PTX559.)  After C&D granted such a waiver, discussions progressed with a telephone
conversation occurring between the parties sometime in late September 2004.  (PTX560; Jan. 24,
2008 Tr. p.m. (Sidebar) at 28:2-10.)

On October 14, 2004, C&D's counsel sent Abbott a formal settlement proposal, to which
Abbott eventually promised a response no later than January 21, 2005.  (PTX561; PTX562;
PTX563; PTX564.)  However, Abbott did not respond until March 7, 2005.  At that time, it

raised issues regarding matters other than the Charlton Patents and indicated that while it

remained interested in settling the dispute regarding the Charlton Patents, it required further

information on C&D's settlement proposal before the offer could be accepted. (PTX567.) In light

of this correspondence and internal discussions, C&D determined that further settlement

negotiations with respect to the Charlton Patents would be fruitless and so  filed suit against

Abbott for infringement on April 20, 2005. (Jan. 24, 2008 Tr. p.m. (Sidebar) at 32:21-33:16.)

## II.    DISCUSSION

### A.    Applicable Law

"Unreasonable and inexcusable delay in filing suit to enforce a patent that causes material

prejudice to the alleged infringer gives rise to a defense of laches." *Giese v. Pierce Chem. Co.*,

29 F. Supp. 2d 33, 38 (D. Mass. 1998) (*citing A. C. Aukerman Co. v. R.L. Chaides Const. Co.*,

960 F.2d 1020, 1028 (Fed. Cir. 1992)).  "Laches is an equitable defense which, if successful, bars

recovery of damages for infringement which occurred prior to the filing of suit." *Stryker Corp v.*

*Zimmer, Inc.*, 741 F. Supp. 509, 512 (D.N.J. 1990).  "The laches defense has two underlying

elements: first, the patentee's delay in bringing suit must be 'unreasonable and inexcusable,' and

second, the alleged infringer must have suffered 'material prejudice attributable to the delay.'"

*Intirtool, Ltd. v. Texar Corp.*, 369 F.3d 1289 (Fed. Cir. 2004) (*citing A.C. Aukerman,* 960 F.2d at

1028). As the defense of laches has its "origins in equity, a determination of laches is not made

upon the application of 'mechanical rules.'" *Id.* at 1032 (citation omitted).  Instead, the Court

"must look at all of the particular facts and circumstances of each case and weigh the equities of

the parties." *Id.*  (citation omitted).

### 1.      Presumption of Laches

"The length of time that may be deemed unreasonable has no fixed boundaries, but rather depends on the circumstances of the case." *Ecolab, Inc. v. Envirochem, Inc.*, 264 F.3d 1358, 1371 (Fed. Cir. 2001) (*quoting A.C. Aukerman*, 960 F.2d at 1030).   However, "[a] presumption of laches arises 'where a patentee delays bringing suit for more than six years after the date the patentee knew or should have known of the alleged infringer's activity.'" *Intirtool*, 369 F.3d at 1297 (*quoting A.C. Aukerman*, 960 F.2d at 1028).   This presumption requires the court to infer unreasonable delay and resulting prejudice.   The plaintiff must then come forward with sufficient evidence to raise a genuine factual issue with respect to the reasonableness of the delay or prejudice.   *A.C. Aukerman*, 960 F.2d at 1037-39.   If the plaintiff puts forth such evidence, "the presumption evaporates and . . . the [defendant] would then have to satisfy its burden of persuasion with actual evidence." *Id.* at 1037-38.   Once the presumption is overcome, the defendant is required to affirmatively prove both elements of laches.   *Hemstreet v. Computer Entry Systems Corp.*, 972 F.2d 1290, 1293 (Fed. Cir. 1992).   These elements must be proven by a preponderance of the evidence and should be "judged on the totality of the evidence presented." *A.C. Aukerman*, 960 F.2d at 1045, 1038.   Finally, it should be noted that "at all times, the defendant bears the ultimate burden of persuasion of the affirmative defense of laches." *Id.* at 1038.

Turning to the facts of the instant case, the'921 Patent and the '982 Patent issued on November 23, 1999 and November 26, 2002, respectively.    C&D filed suit against Abbott on April 20, 2005.   (Compl. at 6.)   Since less than six years has passed from the time that these

patents were issued and the time that C&D filed its infringement suit, the presumption of laches does not arise with respect to these patents.  *Intirtool*, 369 F.3d at 1297 (*quoting A.C. Aukerman*, 960 F.2d at 1028.)  Further, based on the evidence put forth on Abbott's JMOL, this Court has previously held that "C&D has rebutted the presumption of laches because it met its burden of coming forward with sufficient evidence to raise a genuine factual issue respecting the reasonableness of the delay."  (JMOL Mem. Op., 25 (Docket No. 292.)) Because the presumption of laches either never existed or has been overcome by C&D, Abbott is now required to affirmatively prove both elements of laches by a preponderance of the evidence.  *Hemstreet*, 972 F.2d at 1293;  *A.C. Aukerman*, 960 F.2d at 1045.

### 2.    Unreasonable Delay

In determining whether a plaintiff's delay in filing its infringement suit is unreasonable, a court must "consider and weigh any justification offered by the plaintiff for its delay."  *A.C. Aukerman*, 960 F.2d at 1033.  Courts have recognized both other litigation and negotiations with the accused infringer as valid excuses for such delay.  *Id.* (*citing Jamesbury Corp. v. Litton Indus. Prods., Inc*., 839 F.2d 1544,1552-53 (Fed. Cir. 1988), *overruled in part by A.C. Aukerman*, 960 F.2d at 1038-39; *Hottel Corp. v. Seaman Corp*., 833 F.2d 1570, 1572-73 (N.D. Oh. 1987) *overruled in part by A.C. Aukerman*, 960 F.2d at 1038-39; *American Home Prods. v. Lockwood Mfg. Co.*, 483 F.2d 1120, 1123 (6th Cir. 1973); *Baker Mfg. Co. v. Whitewater Mfg. Co.*, 430 F.2d 1008, 1013-14 (7th Cir. 1970),  *cert. denied*, 401 U.S. 956 (1971)).  Courts have also held that proceedings before the USPTO are a reasonable cause for delay.  *See Vaupel Textilmaschinen KG v. Meccanica Euro Italia S.P.A.*, 944 F.2d 870, 877 (Fed. Cir. 1991)

(holding that delay is excused when plaintiff is involved in a reissue proceeding before the

USPTO and reasoning that, for the purposes of laches, "[t]here is no demonstrable distinction . . .

between judicial proceedings raising the issue of patent validity and a PTO proceeding involving

patentability"); *Bernandy v. Powell*, No. 04-5604, 2005 U.S. Dist. LEXIS 25644, at *17-18

(W.D. Wash. Oct. 19, 2005) (holding that a plaintiff's participation in an interference proceeding

constitutes a reasonable excuse for delaying filing of suit) (*citing A.C. Aukerman*, 960 F.2d at

1033).  A change in ownership of the patents due to acquisition or corporate reorganization can

also excuse delay in filing suit.  *See Genzyme Corp. v. Atrium Med. Corp.*, No. 00-958,  2003

U.S. Dist. LEXIS 12784, at *17 (D.Del. July 22, 2003 ("change in management" held to be

reasonable excuse for delay); *Cedarapids, Inc. v. CMI Corp.,* No. 98-110, 2000 U.S. Dist. LEXIS

22743, at *24-25 (N.D. Iowa Nov. 2, 2000) (corporate reorganization can excuse delay) (citing

*James River Corp. v. Hallmark Cards*, 915 F. Supp. 968, 978 (E.D. Wis. 1996)).

### a.    Other Litigation

Prior to the decision in *A.C. Aukerman*, in order for litigation to excuse an otherwise

unreasonable delay, a defendant must have had notice of the litigation and of the plaintiff's

intention to enforce its rights against the defendant upon completion of this other litigation.

*Giese* 29 F. Supp. 2d at 40 (internal citations omitted).  However, in *A.C. Aukerman*, the court

"restore[d] equitable flexibility: '[t]he equities may or may not require that the plaintiff

communicate its reasons for delay to the defendant.'" *Hemstreet,* 972 F.2d at 1293 (*quoting A.C.

Aukerman,* 960 F.2d at 1033).  The court reasoned "[t]here can be no rigid requirement in

judging a laches defense that such notice must be given.  If a defendant is, for example, aware of

12

the litigation from other sources, it would place form over substance to require a specific notice."
*Id.* at 1039 (citing *Vaupel,* 944 F.2d at 878).

In the instant case, C&D informed Abbott of the Interference Proceedings during a March

8, 2001 phone conference between Mr. Clarke and Mr. Schapals. (Sept. 16, 2008 Tr. at 109:24-

110:15; PTX581.) C&D alerted Abbott of the Acon Litigation through a letter dated February 2,

2004. (PTX47.) With respect to the Pfizer Litigation, Abbott received notice of this matter

from Pfizer through three separate communications as well as its eventual service of a subpoena

on Abbott for information relating to this litigation. (PTX568; PTX569; PTX570.) Further,

despite the fact that Armkel, and not C&D, was the named plaintiff in the litigation, Abbott was

aware that Armkel had purchased Carter-Wallace's consumer products division and that Armkel

was associated with C&D prior to its receiving notice of the Pfizer Litigation. (PTX584;

PTX585; PTX587; Aug. 27, 2008 Tr. at 87:18-20.) In contrast, C&D has put forth no evidence

that Abbott received notice of the Quidel Litigation from any source and Mr. Schapals testified

that he became aware of the matter only after it had settled. (C&D Unsealed Br. (Docket No.

307) at 6, 10-11; Aug. 27, 2008 Tr. at 90:8:14.)

In light of these facts, the equities permit the excuse of C&D's delay in filing suit for the

periods in which it was engaged in the Interference Proceedings, the Acon Litigation and the

Pfizer Litigation because Abbott received sufficient notice of these matters, whether from C&D

or other parties. *See A.C. Aukerman*, 960 F.2d at 1039 (citing *Vaupel* 944 F.2d at 878); (Sept. 16,

2008 Tr. at 109:24-110:15; PTX581; PTX47; PTX568 at ABBOTT/C&D 117184; PTX569;

PTX570.) However, because Abbott was unaware of the Quidel Litigation until after its

13

completion, C&D's delay in filing suit during the pendency of this matter should not be excused. *See Northern Telecom., Inc. v. Datapoint Corporation*, No. CA3-82-1039-D,1992 U.S. Dist. LEXIS 8068 at *14-15 (N.D. Tex. June 4, 1992) (holding that communications regarding other litigation after such litigation had settled insufficient to excuse delay in filing suit).

### b.    Negotiations

As Abbott correctly notes, "[t]he general rule is that license negotiations do not necessarily push back the running of time in a laches defense." (Abbott Unsealed Br. at 9 (*citing A.C. Aukerman Co. v. Miller Formless Co.*, 693 F.2d 697, 700 (7th Cir. 1982) (*citing Gen. Elec. Co. v. Sciaky Bros.*, 304 F.2d 724, 727 (6th Cir. 1962)).  However, negotiations may excuse a patentee's delay in filing suit if they are "continuous and bilaterally progressing, with a fair chance of success, so as to justify significant delays." *Id.*; *see also Motorola, Inc. v. CBS, Inc.*, 672 F. Supp. 1033*, 1036-37 (N.D. Ill. 1986)**; *Harley-Davidson, Inc. v. Estate of O'Connell*, 13 F. Supp. 2d 271, 280 (N.D.N.Y. 1998) (*citing MGA, Inc. v. Centri-Spray Corp.*, 639 F. Supp. 1238, 1243 (E.D. Mich. 1986)**; *Giese*, 29 F. Supp. at 40 (*citing Gen. Elec. Co.,* 304 F.2d at 727*; Cont'l Coatings Corp. v. Metco, Inc.,* 464 F.2d 1375, 1377-78 (7th Cir. 1972.)   In contrast, negotiations that are "sporadic, unfruitful, and one-sided, with little chance of success" are insufficient to excuse such delay. *Motorola, Inc.*, 672 F. Supp. at 1037.

Courts have held that negotiations are not continuous when neither party has a belief that the negotiations are ongoing or when a party conveys that it is uninterested in pursuing a licensing agreement. *Harley-Davidson, Inc.*, 13 F. Supp. 2d at 280; *see also Valutron, N.V. v. NCR Corp.*, No. C-3-81-444, 1992 U.S. Dist. LEXIS 22129*, at *20-21 (S.D. Oh. Aug. 18, 1992)

14

(holding negotiations insufficient to excuse delay when the record did not "reflect any genuine belief, reasonable or otherwise, on [the patentee's] part that negotiations were taking place" and the defendant "never expressed any interest in taking a license, the parties never met face to face or spoke by telephone, no terms were ever discussed, and the communications were marked by one hiatus of eight months and another of thirteen months."); *Cornell Research Found., Inc. v. Hewlett-Packard Co.,* No. 01-1974, 2007 U.S. Dist. LEXIS 89637, at *130-31 (N.D.N.Y., Jan. 31, 2007) (holding that negotiations cannot be considered ongoing where a defendant maintained its belief that it was not infringing and so was not interested in obtaining a license).

 In the instant case, Abbott argues that the correspondence between the parties does not constitute continuous and bilaterally progressing negotiations, whereas C&D contends that the negotiations do meet that standard (Abbott Unsealed Br. at 9-11; C&D Unsealed Br. at 11-12.) The Court agrees with C&D that the negotiations between the parties provide reasonable excuse for C&D's delay in filing suit.

 On February 27, 1998, Carter-Wallace sent notice of the '389 Patent to Abbott and stated that it was "interested in exploring the licensing of this new patent."   (PTX 38.)   The parties subsequently engaged in discussions regarding licensing, including a June 5, 1998 telephone conversation where Abbott expressed a desire to discuss licensing.  (PTX39; DTX493.)  In a letter dated August 24, 1998, Abbott reiterated this interest by requesting that Carter-Wallace send them proposed licensing terms. *Id.*  Although Carter-Wallace indicated that it could not engage in negotiations with Abbott at that time because it was negotiating licensing terms with other parties, it nevertheless conveyed that it was interested in continuing licensing negotiations

at a later date.  (DTX1042.)

Upon resolution of the Interference Proceedings in April 2001, further negotiations took place between Carter-Wallace and Abbott during the period of March through September 2001.  (PTX488; PTX491; Aug. 27, 2008 Tr. at 61:14-65:2; PTX581.)  These communications included a March 8, 2001 telephone conference between Mr. Schapals and Mr. Clarke as well as subsequent phone conference between these men on March 20, 2001 in which both parties indicated a willingness to engage in further discussions regarding the licensing of the Charlton Patents.  (PTX 381; PTX581.)  Abbott reiterated its desire to negotiate in its April 18, 2001 letter to Carter-Wallace.  (PTX381.)  Discussions continued between August 2001 and September 13, 2001, when Carter-Wallace sent a letter to Abbott expressing its desire to negotiate and enclosing its own version of a non disclosure agreement.  (DTX1039; PTX582; PTX40 at ABBOTT/C&D 118422.)

Negotiations further continued between the parties from February 2, 2004 up and through the time that C&D filed suit in April 2005.  Through several letters and at least one telephone conference, negotiations progressed to the point that on October 14, 2004, C&D's counsel sent Abbott a formal settlement proposal to which Abbott eventually promised a response no later than January 21, 2005.  (PTX44; Jan. 24, 2008 Tr. p.m. (Sidebar) at 21:6-25:6; PTX556; PTX557; PTX558; PTX559; PTX560; Jan. 24, 2008 Tr. p.m. (Sidebar) at 28:2-10; PTX561; PTX562; PTX563; PTX564.) Only after receiving Abbott's response on March 5, 2007, in which it indicated that it needed further information regarding C&D's proposed settlement, did C&D determine that negotiations had become fruitless and so filed suit against Abbott.  (PTX567; Jan.

24, 2008 Tr. p.m. (Sidebar) at 32:21-33:16.)

These facts demonstrate that C&D and Abbott were engaged in negotiations sufficient to excuse C&D's delay in commencing litigation for infringement of the Charlton Patents. The evidence shows that both parties demonstrated a continued desire to resolve the matter through settlement and licensing up and until immediately prior to C&D's filing suit. (*See e.g.* PTX38; DTX493; PTX381; PTX558.)

Abbott, however, characterizes these negotiations as "[t]hree sets of brief communication by C&D in which C&D expressed only a desire to license the Charlton patents, punctuated by gaps of roughly three years" and that such communications cannot be categorized as sufficiently continuous and bilaterally progressing to justify significant delays in filing suit. (Abbott Unsealed Br. at 11 (*citing Aukerman*, 693 F.2d at 700)).  Abbott correctly notes that there were two periods in which communications appear to have ceased between the parties: (1) from approximately August 1998 through March 8, 2001, during which time Carter-Wallace was engaged in the Interference Proceedings; and (2) from approximately October 2001 through February 2, 2004, during which time Carter-Wallace sold its consumer products division to C&D and Armkel and the Pfizer and Acon Litigations were initiated.  (PTX584; PTX585; PTX587; PTX106; PTX488; PTX489; PTX490; PTX587; Jan. 24, 1998 Tr. a.m. at 61:2-18; Jan. 24, 2008 Tr. p.m. at 18:22-19:11; Jan. 24, 2008 Tr. p.m. (Sidebar) 34:7-25.)

A change in management or corporate reorganization of the patent holder can be an excuse for delay in filing suit.  *See Genzyme Corp,*, 2003 U.S. Dist. LEXIS 12784 at *17; *Cedarapids, Inc.,*  2000 U.S. Dist. LEXIS 22743 at *24-25 (citing *James River Corp. v.*

17

*Hallmark Cards*, 915 F. Supp. at 978).  Carter-Wallace sold its consumer products division to Armkel and C&D in October 2001, as which time Armkel acquired the Charlton Patents. (PTX587, PTX384, Jan. 24, 2008 Tr. a.m. at 59:15-61:1).  C&D's February 2, 2004 letter indicated that C&D and Armkel went through a period of transition after purchasing the Charlton Patents from Carter-Wallace and C&D had taken the time to review the correspondence between Abbott and Carter-Wallace before contacting Abbott regarding licensing.  (*See* PTX47.)

Additionally, C&D was actively engaged in the enforcement of its rights under the Charlton Patents against other parties during both of these periods. *See Hemstreet* 972 F.2d at 1293 (Fed. Cir. 1992) (reasoning that a patentee may have a valid excuse for delaying litigation where it was busy enforcing its rights elsewhere.)  "This flurry of activity helps to excuse the sporadic nature of . . . contact . . . during this period."  *Haworth, Inc. v. Herman Miller, Inc.*, 856 F. Supp. 354, 357 (W.D. Mich. 1994) (holding that litigation and negotiations with other parties excused gaps in settlement discussions between plaintiff and defendant.)  As previously mentioned, Abbott was aware of the Pfizer and Acon Litigations as well as the Interference Proceedings. (Sept. 16. 2008 Tr. at 109:24-110:15; PTX581; PTX47; PTX568 at ABBOTT/C&D 117184; PTX569; PTX570).  Further, Carter-Wallace and C&D always maintained and reiterated their intent to enforce their rights under the Charlton Patents in each of its communications with Abbott throughout the negotiations period. (*See e.g.* DTX1042; PTX40; PTX47.)  Thus, despite the fact that C&D's negotiations with Abbott during this period "cannot be characterized as consistent," the overall equities require a finding that C&D's attempts to resolve this matter through negotiations are a reasonable excuse for its delay in filing suit.  *Haworth, Inc.* 856 F.

18

Supp at 357-58 (holding that inconsistent negotiations were a reasonable excuse for delay when defendant was aware of plaintiff's participation in other litigation and plaintiff alerted defendants of its intent to enforce its rights under the patent.)

### 3.  Material Prejudice

Under the second element of the laches defense, the alleged infringer must also prove that it has "suffered 'material prejudice attributable to the delay.'" *Intirtool, Ltd.*, 369 F.3d at 1297 (*citing A.C. Aukerman,* 960 F.2d at 1028). Such prejudice may be economic or evidentiary. *Giese*, 29 F. Supp 2d at 38. Economic prejudice includes the damages or the loss of monetary investments which would have been prevented by a patentees' earlier filing of suit. *Id.* (*citing A.C. Aukerman*, 960 F.2d at 1033.) Such prejudice must result from a "change in the economic position of the alleged infringer during the period of delay" and must be more than that attributable to a finding of infringement. *A.C. Aukerman*, 960 F.2d at 1033 (citations omitted); *Northern Telecom*, 1992 U.S. Dist. LEXIS 8068 at *31-32 ("[t]hese damages are not merely those attributable to a finding of liability for infringement, lest economic prejudice arise in every suit.") (citation omitted). Evidentiary prejudice consists of harm to the defendant's ability to present a full and fair defense on the merits by reason of loss of records, the death of witnesses, or the fading of memories. *See A.C. Aukerman*, 960 F.2d at 1033 (citations omitted).

Because Abbott failed to put forth sufficient evidence to prove the first element of laches, specifically, that C&D's delay in bringing suit must be unreasonable and inexcusable, the Court does not reach the issue of whether Abbott put forth sufficient evidence to prove it suffered

19

material prejudice as a result of C&D's delay.[3]

III.   **CONCLUSION**

For the foregoing reasons, Abbott's Motion for Judgment that Plaintiff's Claim of

Damages is Barred under the Doctrine of Laches (Docket No.318) is denied.

Dated:  December 23, 2008

_____s/ Garrett E. Brown, Jr._____
GARRETT E. BROWN, JR., U.S.D.J.

---

[3]At the August 27, 2008 hearing, Abbott offered certain deposition designations from the depositions of Dr. Lawrence J. Stern, Ph.d., Robert Schruender, and Carmen Bergelin, arguing that these designations are relevant to the question of whether Abbott suffered evidentiary prejudice as a result of C&D's delay in filing suit. (Aug. 27, 2008 Tr. at 116:8-15.)  C&D objected to such submissions and also offered its own counter designations for admission should the Court admit Abbott's designations into evidence. (*Id*. at 115:9-13; 116:22-117:2; 117:5-23.) Because the Court does not reach the issue of whether Abbott suffered material prejudice as a result of C&D's delay in filing suit, the Court will also refrain from ruling on the deposition designations and counter-designations' relevance and admissibility.